PACHECO (UNITED STATES v.). See Cases Nos. 15,980–15,982.

## Case No. 10,642.

### The PACIFIC.

District Court, S. D. Florida. 1857.

SALVAGE—AMOUNT—DAMAGE TO GOODS—LEAK IN SALVING VESSEL.

[1. Cited in The Mulhouse, Case No. 9,910, to the point that the owner of a vessel employed in the business of wrecking is liable for damages happening to goods taken on board from a wreck, caused by the leaky condition of his vessel.]

[2. Cited in Baker v. The Slobodna, 35 Fed. 542. as an instance in which 30 per cent. was allowed as salvage for cargo saved to the value of $29,776.]

[Nowhere reported; opinion not now accessible.]

## Case No. 10,643.

### The PACIFIC.

[1 Blatchf. 569;[1] 8 N. Y. Leg. Obs. 340; 36 Hunt, Mer. Mag. 575.]

Circuit Court, S. D. New York. Oct. Term, 1850.

ADMIRALTY JURISDICTION — SHIPS CARRYING PASSENGERS—CONTRACT AS AN ENTIRETY.

1. Ships engaged in carrying passengers on the high seas for hire, stand on the same footing of responsibility, according to the maritime law, as those engaged in carrying merchandize, the passage money being the equivalent for the freight; and, therefore, on a breach of a passenger contract, and damage resulting, the ship as well as the owner is bound to respond. The case of The Aberforle [Case No. 17] cited, and its doctrine confirmed.

[Cited in A. M. Bliss, Case No. 274.]

2. The owner of a ship bound from New-York to California, agreed with C., at New-York, to take him as a cabin passenger, with his luggage, at $300; not more than 50 cabin passengers to be received, for which reason the fare was raised from $250, the usual charge; state-rooms to be fitted up between decks on each side, with a free passage between, disencumbered with freight, for ventilation and exercise; and the vessel to sail on the 5th of January. C. paid his passage money on the 2d. He lived in Massachusetts, and prepared for the voyage at considerable expense, and went to New-York at the time appointed for sailing, when he found that the state-rooms had no space between them for ventilation or exercise, in consequence of the increased number of them, and that 72 cabin passengers had been engaged, many at $275 each,

so that the vessel was overcrowded with passengers and cargo, and incommodious, and dangerous to health. C. refused to embark, and demanded back his passage money, which was refused. He then, on the 20th of January, filed a libel in rem against the ship, for the return of the passage money and for his damages: *Held*, that the admiralty had jurisdiction of the case, and that the ship was liable.

3. The contract was an entirety. It is wholly of admiralty cognizance, or else it is not at all within it, as there cannot be a divided jurisdiction.

4. The stipulations in the contract, as to the fitting up of the ship, &c., were incidental and subsidiary to the main purpose of the contract, which was to convey the libellant and his luggage to California. Those stipulations have nothing to do with determining the nature of the contract, or with the question of jurisdiction.

5. As the contract was an entirety, the failure to comply with any part of it went to the whole. The libellant had a right to demand a strict compliance with every part, and, in case of refusal, to consider the contract as broken.

[Cited in Cobb v. Howard, Case No. 2,925.]

6. In the case of a contract maritime in its nature and subject, it is not essential, in order to give jurisdiction to the admiralty in rem, that the vessel should have entered on the performance, or that the breach should have occurred in the course of the voyage.

[Cited, but not followed, in The General Sheridan, Case No. 5,319. Cited in Oakes v. Richardson, Id. 10,390; The City of Brussels, Id. 2,745; The Williams, Id. 17,710; Scott v. The Ira Chaffee, 2 Fed. 403. Cited, but not followed, in The Monte A., 12 Fed. 333. Distinguished in The City of Baton Rouge, 19 Fed. 462.]

7. A maritime contract depends upon its subject matter, and, when entered into for the conveyance of goods or persons in a particular ship, it binds the ship. Her obligation results directly from the contract, and not from the performance, and the liability of the owner and that of the ship attach at the same time.

[Cited in Cobb v. Howard, Case No. 2,925. Cited, but not followed, in The General Sheridan, Id. 5,319. Cited in The Williams, Id. 17,710.]

8. In the case of a contract with a materialman, or one for repairs, the liability of the vessel arises from the furnishing of the supplies, or the making of the repairs. Short of actual repairs or supplies, the party claiming damages for a breach of contract must look to the master or owner.

[Cited in The Cabarga, Case No. 2,276; The California, Id. 2,312; James Dalzell's Son & Co. v. The Daniel Kaine, 31 Fed. 748; The James H. Prentice, 36 Fed. 781.]

[Appeal from the district court of the United States for the Southern district of New York.]

Charles D. Cleaveland filed a libel in rem, in the district court, against the ship Pacific [her tackle, etc.][2] then lying in the port of New-York [and against the owners and master],[2] for a breach of a passenger contract. The libel set forth, that the vessel was bound on a voyage from New-York, around Cape Horn, to San Francisco in California; that her owners agreed with the libellant, at New-York, to take him, as a cabin passenger, together with his luggage, the

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

[2] [From 8 N. Y. Leg. Obs. 341.]

fare to be $300; that in order that this class of passengers might have all the accommodations desirable for so long and tedious a voyage, and sufficient space for exercise and air, not more than fifty cabin passengers were to be received on board; that the passage money was, by reason thereof. raised to $300, instead of being $250, the usual charge; that staterooms between decks were to be fitted up, making separate apartments for two passengers each, the rooms to be arranged on each side of the vessel, leaving a free passage-way between disencumbered with freight, for ventilation and exercise; that the vessel was to sail on or about the 5th of January, 1849; that the libellant's passage money was paid on the 2d of that month; that the libellant, who was a resident of Massachusetts, prepared himself for the voyage at considerable expense, and came to the city of New-York at the time appointed for the departure of the vessel, for the purpose of embarking in her and starting on the voyage, when he found that the staterooms, instead of being fitted up, as was agreed, for the accommodation and health of the passengers. had no space between them for ventilation or exercise, in consequence of the increased number that had been constructed; that seventy-two cabin passengers had been engaged for the voyage, and were to be taken on board, the price as to many of them having been reduced to $275 each, by reason whereof the vessel was overcrowded with passengers and cargo, and rendered incommodious and dangerous to health; that the libellant, on ascertaining these facts, refused to embark, and demanded a return of his passage money, which was refused. The libel was filed on the 20th of January, 1849, claiming a return of the passage money, and damages to the amount of $1000. The claimants filed a demurrer to the libel, alleging that the contract on which it was founded was not one of which a court of admiralty could take cognizance; and that, if the same or any part of it was cognizable in admiralty, no cause of action had arisen on it at the time the libel was filed. The district court overruled the demurrer, and pronounced for the libellant, for the return of his passage money and his damages [case unreported], and the claimants appealed to this court.

William Allen Butler, for claimants.

I. The contract on which the libel is founded, though including, as one of its terms, an obligation on the part of the owners of the ship, to convey the libellant and his effects from New-York to San Francisco, included, also, as the same is set forth in the libel, various other obligations. which were to be performed before the sailing of the vessel and preparatory thereto, within the city and county of New-York, where the contract was made. For, according to the libel, the owners also agreed: 1st. Not to take more than 50 cabin passengers, and, by reason thereof, to charge $300 for each passenger, and not to take any passenger for any less price. 2d. That the vessel was not to be crowded, and that freight should not be taken to the inconvenience of the passengers. 3d. That the state-rooms to be put up in the cabin, should only occupy the sides of the after part of the vessel; and the middle of the cabin was to be left open for ventilation, and the comfort and health of the passengers. 4th. That there should be no choice of state-rooms or berths, but they should be distributed equally by lot. 5th. That the state-rooms to be put up should be each at least six feet square, and well ventilated and lighted. The contract charged is, therefore, a contract to fit up the ship in a particular and specified manner; to take only a limited number of passengers, and a limited quantity of freight; to exact from such passengers a uniform specified price; to give to each passenger an equal chance by lot in respect to state-rooms or berths; and then to convey the libellant (who had paid the specified price) from New-York to San Francisco.

II. Conceding. according to decisions of the district court for this district (Marshall v. Bazin [Case No. 9,125]), one of which has been affirmed in this court (The Aberfoyle [Id. 17]), that a contract to convey passengers is within the jurisdiction of the courts of admiralty (a proposition upon which the supreme court of the United States has not yet passed), it is still insisted, that the contract in the present case is not within the admiralty jurisdiction, because it is not solely and exclusively for the conveyance of the libellant and his effects to San Francisco, but embraces in addition the several undertakings above specified, which are merely preliminary to the contemplated voyage. 1st. To give jurisdiction to the courts of admiralty in a case of contract, the contract charged and broken must be for the performance of maritime services. The Thomas Jefferson, 10 Wheat. [23 U. S.] 428; Peyroux v. Howard, 7 Pet. [32 U. S.] 343; Hobart v. Drogan, 10 Pet. [35 U. S.] 119, 120; The Orleans v. Phœbus, 11 Pet. [36 U. S.] 183; Thackarey v. The Farmer [Case No. 13,852]; New Jersey Steam-Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 385. 2d. The several things contracted to be done before the sailing of the vessel, though they related to the ship, and to the contemplated conveyance of the libellant and his effects in her, were not in themselves maritime services; and, if the contract had been confined to them, it would not have been a maritime contract cognizable in admiralty. Montgomery v. Henry, 1 Dall. [1 U. S.] 49; The Tribune [Case No. 14,171]; Andrews v. Essex Fire & Marine Ins. Co. [Id. 374]; Plummer v. Webb [Id. 11,233]. 3d. It is not enough that the contract includes an obligation or some obligations of a maritime nature; it must, as an entirety, in all its material and substantial

parts, be for the performance of maritime services. The whole contract must, in its essence, be maritime, or for compensation for maritime services. 4th. The contract in question being one and indivisible, and including various extrinsic obligations to perform services not maritime, the non-performance of which constitutes the sole ground of action, the case is wholly without the limits of the admiralty jurisdiction.

III. At the filing of the libel, no cause of action upon the contract, cognizable in any court, had arisen. 1st. The ship was then lying in the port of New-York. 2d. It is not pretended in the libel, that the voyage was broken up or abandoned; on the contrary, it is admitted therein, that the ship is ready for sea and about to sail on the voyage contracted for. 3d. It is not pretended by the libellant, that the owners or master refused to receive him in the ship, and to convey him to San Francisco; on the contrary, the libellant claims that he is not bound to go in her, but is entitled to remain, and to have a return of the passage money paid by him, and damages. 4th. The gravamina of the libel relate, exclusively, to matters to be performed within the county of New-York, preparatory to and at the sailing of the vessel. 5th. In cases of this sort, where, by the refusal of one party to perform, the other party has a right to treat the contract as terminated, his remedy to recover back money advanced, is not by an action on the contract, but by an action for money had and received, treating the contract as wholly at an end. Giles v. Edwards, 7 Term R. 181; Gillet v. Maynard, 5 Johns. 85; Raymond v. Bearnard, 12 Johns. 274; Watson v. Duykinck, 3 Johns. 335; Griggs v. Austin, 3 Pick. 20.

IV. At all events, at the filing of the libel, no cause of action of admiralty cognizance had arisen. 1st. The true basis of admiralty jurisdiction is, that the consideration, the performance, and the execution of the contract are on the sea. The mere fact that a contract has been made which relates to a ship or to a performance at sea, does not give admiralty jurisdiction, where nothing is done at sea under, or in performance, or in violation of the contract. 2d. Nor did the admiralty acquire jurisdiction over the contract by reason of its supposed abandonment by the owners of the ship. The mere fact that the contract, if executed, would have given admiralty jurisdiction, will not give such jurisdiction when it has been wholly abandoned before any maritime transaction under it. 3d. The doctrine that the contract had been broken and terminated by the refusal of the claimants to perform the same according to its terms, and that therefore the court had jurisdiction of the case, and could give relief therein, is wholly inapplicable in a court of admiralty, which, in cases ex contractu, can only take cognizance of actions founded directly on the contract. Dean v. Bates [Case No. 3,-704]; Leland v. The Medora [Id. 8,237]. 4th. Considered as a proceeding in rem, the jurisdiction asserted in the present case is especially untenable. (1) The jurisdiction of courts of admiralty in rem proceeds upon the principle, that, from the nature of the contract or of the facts, the ship herself is to be regarded, in contemplation of law, as a participant in the contract, or in the facts from which the liability results, and is therefore responsible. (2) In respect to those parts of the contract in question which are alleged to have been broken, the libellant stood on the personal security of the owners, and not on the security of the ship. (3) A maritime contract may be made on the faith of the ship, as well as on that of the owners or master; but it cannot be broken so as to attach liability to the ship, unless the ship herself has done, or has been caused to do, some act in violation of the contract. No such act had been done by or with the ship, when the libel was filed, and therefore no cause of action had then accrued against her.

V. The decision in the present case extends, inconveniently and without necessity, the jurisdiction of courts of admiralty. 1st. To permit a person who has contracted for a passage in a vessel, on the condition that certain accommodations shall be prepared for him, to libel and detain the vessel, at the moment of departure, because such accommodations have not been prepared, would not only expose the owners of vessels engaged in the transportation of passengers by sea or on tide waters, to extortion and injustice, but be productive of serious public inconvenience. 2d. Such an extension of the admiralty jurisdiction is unnecessary to the ends of justice. The courts of law and equity are perfectly competent to give adequate redress; and, as the case stood at the filing of the libel, the remedy of the libellant was exclusively to be sought in such courts.

VI. The false representations and pretences alleged in the libel to have been made, and the deceit alleged to have been practised, by the owners and their agent, do not constitute a marine tort cognizable in a court of admiralty, but are exclusively of common law jurisdiction, because done, not on the sea, but entirely upon the land.

Francis B. Cutting and Charles B. Moore [and R. Goodman], for the libellant.

The contract set forth in the libel in this case was a maritime contract, over which the district court had jurisdiction.

I. Its object, essence and whole purpose was the freighting of the vessel; the conveyance of the libellant as a passenger, with his luggage, for freight, on a single voyage from New-York, around Cape Horn, to California; a service to be performed exclusively on the high seas and on tide waters

(where the vessel already was), and pertaining exclusively to the business of commerce and navigation. The general principle has been often maintained; and there is no distinction between the carriage of passengers and of merchandize. The Aberfoyle [Case No. 17]; Marshall v. Bazin [Id. 9,125]; The Zenobia, cited in Marshall v. Bazin; The Rebecca [Case No. 11,619]; The Phebe [Id. 11,064]; The Volunteer [Id. 16,991]; The Tribune [Id. 14,171]; De Lovio v. Boit [Id. 3,776]; 3 Kent, Comm. 218; Howland v. The Lavinia [Case No. 6,797]; Plummer v. Webb [Id. 11,233]; The Thomas Jefferson, 10 Wheat. [23 U. S.] 428; Waring v. Clarke, 5 How. [46 U. S.] 441; New Jersey Steam-Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 344; Moffat v. East India Co., 10 East, 468; Abb. Shipp. (Story & Perk. Ed.) 491, notes, and cases cited.

II. The minute terms of the contract, which must always be attended to in determining whether it has been performed or broken, are varied in different cases, but can have no effect upon the question of jurisdiction. In nearly all the cases cited questions arose upon such special terms, which were often the whole occasion of controversy. In the case first cited, of The Aberfoyle [supra], the passenger was to have not less than ten cubic feet for luggage, and three quarts of water per day, and the breach was, that the allowance was withheld. In the case of The Zenobia [supra], passage money being paid in advance, the breach was the leaving the passengers behind. Cases founded on any such contracts, bills of lading, charter parties, &c., generally turn upon the like special terms.

III. In the present case, the terms and conditions are all incidental to the maritime service, and relate merely to the safety, health and comfort of the passenger on the voyage. That the engagements in question are thus incidental in their character, and are highly important and necessary, and relate to foreign commerce, and to matters acknowledged to be peculiarly within the province of the federal courts, will appear by the passenger act of February 22, 1847 (9 Stat. 127), which was not applicable to this voyage when it was commenced, but was applied to it by the act of March 3, 1849 (9 Stat. 399). Without any such special or minute definition of terms, a mere agreement to take passengers would imply that they were to be taken in a safe, healthy, and comfortable manner; and, as to the precise manner, the number, &c., reference would be had to mercantile usage, and to all the circumstances. It cannot destroy the jurisdiction to specify these particulars, instead of leaving them to be implied and to be open for contestation.

IV. The libel is, in substance, founded upon the contract, and is for a breach of performance on the part of the vessel and owners, occurring after the contract had become binding, as such, upon the vessel. By advertising and preparing the vessel for the voyage, appointing a day to sail, receiving the passage money, requiring the passengers to be ready, and, when the vessel was about to sail, refusing to return the money or comply with the terms agreed upon, the owners assumed that there was a maritime contract, and put themselves upon the question, whether the libellant or the vessel was in fault for its non-performance.

V. The contract itself may be counted upon, though it be broken in the very outset. 1st. A breach in such particulars may be urged in an action in any court upon the contract itself, and damages for the breach be claimed. It was not necessary to wait longer, to show a breach of the contract. Chit. Cont. 486, 531; Long v. Horne, 1 Car. & P. 610; North's Adm'rs v. Pepper, 21 Wend. 636; Ford v. Tiley, 6 Barn. & C. 325, 327, 328 (per Bayley, J.), and 9 Dowl. & R. 448; Beswick v. Swindells, 3 Adol. & E. 868; M'Nish v. Coon, 13 Wend. 26; 1 Rolle, Abr. 248, p. 1; Sir Anthony Main's Case, 5 Rep. [Coke] 21, Res. 2. 2d. The mere rescission of the contract (though justifiable under the circumstances, so that the libellant had no option of resorting to it, so far as the mere obtaining back of the passage money paid in advance was concerned) does not afford a perfect remedy nor interfere with the above view. The libellant in this action had a right to recover his actual expenses of being ready and waiting, &c., and damages for the refusal to carry his freight. Hogan v. Shee, 2 Esp. 522; Giles v. Edwards, 7 Term R. 181; Driggs v. Dwight, 17 Wend. 71; Freeman v. Clute, 3 Barb. 424. 3d. The claimants are mistaken in a matter of fact, when they urge that the contract was abandoned by the ship-owners, or terminated by their refusal to perform. On the contrary, the ship-owners insisted on the contract, by refusing to repay the money, and by deceptively placing the libellant in a position to incur expense and disappointment if he did not go, and to have his convenience and safety disregarded if he did go.

VI. The claimants' objections are narrowed down to the claim, that the contract provided for a day of sailing, and for a particular manner of fitting the vessel before sailing, and for not taking more than a specified number of other passengers on sailing; that the breaches occurred in these particulars before sailing; that these were parts of the contract not to be performed at sea; and that, if the contract as a whole be deemed maritime, yet these breaches, occurring before the execution by the vessel was commenced, did not afford what is termed a maritime cause of action, or did not occur on the sea, or so as to bind the vessel. To which it may be answered: 1st. That they all occurred within the ebb and flow of the tide, on tide water. The vessel was afloat in the tide, about

to sail on a voyage. The performance of the contract, (though a small part of it, necessarily, was to occur in port before sailing,) was all within the recognized admiralty jurisdiction, which is not confined to matters occurring at sea. The safe, healthy and comfortable manner of carrying the passenger was to commence in port, and a breach of this (necessarily running through the whole voyage) occurred as effectually before leaving port, as it could after. To contend otherwise, is to say that a point blank refusal in port to perform a maritime contract, does not fall within maritime jurisdiction. This answer to the objection answers also the argument ab inconvenienti. The building and fitting of a domestic vessel are performed on land, and, as to them, the admiralty courts enforce only maritime liens given by the local laws. Supplies to a foreign vessel are furnished in port, and payment is generally demanded before the vessel leaves port, and is enforced as a maritime matter, in rem, or in personam. Sailors' services are performed in port as well as at sea, and freight is earned partly in port, and all are compensated for in admiralty, in personam as well as in rem (rules 12, 13), unless a part of the voyage be above tide water. The Thomas Jefferson, 10 Wheat. [23 U. S.] 428. The same rule applies here, and the definition requiring the whole performance to be at sea is unfounded. The idea that the consideration should be at sea is also unfounded. The compensation to be paid a sailor, a pilot, or a ship-owner, for a maritime service, is always on the land. The consideration afforded by the ship-owner in furnishing his vessel, and by the material-man in supplying his goods, occurs on land. 2d. The contract of a passenger is made as much on the faith of the ship, as is that of the freighter or sailor. It is broken, if the ship, when she is about to leave port, refuses performance in a material essential part, such as health and safety, as much as if she were actually to go without the passenger. The ship herself does, or is caused to do, an act in violation of the contract, when she takes other cargo or passengers, and is about to sail with them, refusing to comply with the contract, as much as though she sailed away without the passenger. 3d. No authority has been found to justify the supposed distinction between a maritime contract and a maritime cause of action. There may be a maritime tort, and a maritime cause of action for that tort, depending upon the place where is occurs. A maritime contract does not depend upon locality, but upon its essence, substance and object; and, upon every such contract, there is a maritime cause of action for its breach, the common law right of action, where it is concurrent, being saved by the proviso of the judiciary act. The cases show, that libels for breaches of performance occurring on land have frequently been sustained. Wells v. Osmond, 6 Mod. 238, and 2 Ld. Raym. 1044; Ross v. Walker, 2 Wils. 264; The Tribune [Case No. 14,171].

Benjamin F. Butler and Daniel Lord, in reply.

I. The cases of the Aberfoyle, The Zenobia, and Marshall v. Bazin [supra], so far as they relate to the carriage of passengers, were all cases in which the voyage contracted for had been actually performed, and the libellant had been either improperly left behind, or not treated on the passage in the way contracted for, or, though conveyed in the ship, had failed to pay the passage money. The only other reported case of a libel for or against a passenger, that of Chamberlain v. Chandler [Case No. 2,575], has the same distinguishing feature; the voyage had been performed, but the passenger, during it, had been maltreated. In each of the admiralty cases cited, in which the jurisdiction has been sustained by the supreme court, the voyage contracted for was begun, and either wholly or partially performed.

II. That the minute or special terms of the contract, as contradistinguished from its principal obligation, may be important in determining, in the proper forum, and at the proper time, whether it has been performed or broken, is not denied. But, can a court of admiralty take jurisdiction of a case in which only the minute and special terms of a maritime contract have been broken, while the principal obligation of such contract, that which makes it maritime, has not been broken? That is the question here. Take out of the contract and the libel these minute and special terms, and what is left? Nothing, except the contract to carry the libellant in the ship Pacific to San Francisco, and the libel not only does not show that this contract had been broken when it was filed, but expressly admits the contrary.

III. The position, that particulars reasonably essential to the safety, health and comfort of the passenger are implied in a contract to convey, as such, is no doubt correct. And it may, also, be admitted, that it cannot destroy the jurisdiction to specify these particulars, instead of leaving them to be implied and to be open for contestation. But the question now is, not whether admiralty jurisdiction, otherwise existing, is destroyed by stating these particulars; but whether such statement, with the allegation that in these particulars alone the contract has been broken, gives jurisdiction. Suppose these particulars had all been omitted (and, according to the theory of the libellant, it was not necessary to state them in order to give jurisdiction), what then would the libel have contained? Merely the allegations, that the claimants had contracted to take the libellant to San Francisco in the ship Pacific, which was about to sail for that port; that the claimants were willing to take him in the ship; but that he was unwilling to go, because he anticipated, and even on solid

grounds, that he would not be carried in a safe, healthy and comfortable manner. Would such a libel have given jurisdiction to the admiralty? Certainly not.

IV. It may be admitted that the vessel became bound to the performance of the contract, and of all the terms of the contract, from the day of the making thereof, and that the particulars in which the libel alleges the breach thereof were essential terms of such contract. But the question still recurs—did such breach, occurring before the sailing of the ship, she being actually about to sail, give jurisdiction to a court of admiralty?

V. The common law cases cited on the point of the breach of the contract prove nothing pertinent to the present enquiry, except that there was a perfect remedy in the common law courts, in which, if the owners were the only parties in fault, the libellant might not only have recovered back the passage money advanced by him, but the expenses incurred while waiting. And though, under the old system, this measure of relief might not have been obtained in the technical common law action for money had and received, yet under that system a special action on the case would have secured it; and, under the new Code of Practice, the libellant, in an action stating all the facts, would have obtained all the relief to which the most liberal and enlarged equity could entitle him, with smart money in addition, if called for by the facts of the case.

VI. 1st. The cases of material-men and of seamen's wages referred to, are cases sui generis, and do not touch the question in debate. Nor does it help the solution of this question to say, that the breaches of contract alleged in the libel occurred within the ebb and flow of the tide, or that the contract, taken in the whole, was a maritime contract, for maritime services. If the mere existence of a maritime contract gives a cause of admiralty jurisdiction, whenever and howsoever it may be broken, then a person who had agreed to ship goods, or to take passage in a ship about to sail, and who breaks this contract by refusing to send the goods or to take the passage might be sued in admiralty. But when, and by whom, has such a proposition ever been maintained? And yet, within the latitudinary doctrines urged, these are maritime contracts, providing for maritime services. This shows that the character of the breach, as well as of the contract, is to be looked to, in order to decide whether the case be one of admiralty cognizance. 2d. That the contract of a passenger is made on the faith of the ship may be admitted, so far as regards the obligation to convey, and even to convey (if the ship conveys at all), in the manner and under the circumstances agreed on. But, how can the ship be said to break that part of the contract which defines the manner and circumstances, so long as the principal part of the contract, the obligation to convey,

to which the other matters are merely incidental, has not been broken. To escape this consequence it is said, that the ship, when about to sail in violation of the manner and circumstances, refuses as much to comply with the contract, though willing to take the passenger, as if she had sailed away without him. In the view of abstract justice this may be so, and the common law courts will give the proper remedy. But, is it so, in the view of those rules of admiralty law which limit the jurisdiction of the courts of admiralty to maritime contracts, for maritime services? In view of these rules, the breach of this part of the contract, so far as a breach had occurred at the time of the filing of the present libel, is another and a totally different thing from the sailing of the ship without the libellant. 3d. In the case of Wells v. Osmond (approved in Ross v. Walker) the seamen had not only rendered themselves on board of the ship agreeably to the shipping articles, but had done work on board in the harbor. In the case of The Tribune [supra], the owners not only ordered the cargo, which had been put on board at Frankfort for Lubec, on shore, but voluntarily broke up the voyage to Lubec, and, instead of sending the vessel there, sent her on another voyage.

NELSON, Circuit Justice. In the case of The Aberfoyle [Case No. 17], which came before this court, on appeal from the decree of the district court, in 1848, it was held, that ships engaged in carrying passengers on the high seas for hire, stand on the same footing of responsibility, according to the maritime law, as those engaged in carrying merchandize, the passenger money being the equivalent for the freight; that, therefore, on a breach of a passenger contract, and damage resulting, the ship, as well as the owner, is bound to respond; and that all the reasons in the maritime law for charging the ship in case of the breach of a contract of affreightment of goods and merchandize, applied with equal force in the case of the breach of a passenger contract, and the one was as much the appropriate subject of admiralty jurisdiction as the other.

I abide by that decision, as I have seen nothing since to lead me to change or modify it. That was the case of an emigrant-ship from Liverpool to New-York. The breach of the contract occurred in the course of the passage, the passengers having been kept for many days on short allowance of bread and water, the master having omitted, intentionally or otherwise, to lay in a proper supply of stores. I thought the ship chargeable, upon established principles, the contract being a maritime contract, to be performed on the high seas, and that the passenger was entitled to the remedy against her, the same as the owner of the cargo in case of the breach of a contract of affreightment. In the one case, the ship is bound to carry the

goods safely to the destined port, according to contract, for the freight; in the other, the passenger and his luggage, for the passage money.

The present case is supposed to be distinguishable from the one referred to, and from the principle upon which the decision in it was founded, on the grounds: 1st. That admitting the contract for the passage in the ship for the voyage around Cape Horn to California to be a maritime contract, and the subject of admiralty jurisdiction, the voyage was not broken up by the master, but was actually performed; that it was the fault or neglect of the passenger that the contract in this respect was not carried into effect; that the conditions and stipulations in respect to the ship's accommodations for the voyage, for the breach of which he complains, and which constitute the foundation of his libel, were not, in themselves, the subject of a maritime contract, but related to the fitting up of the ship, and to the limitation of the number of the passengers for convenience and health, and were all of them to be performed before the departure of the vessel on her voyage and preparatory thereto; that these stipulations were not for maritime services, nor was the compensation therefor compensation for maritime services, but were services and duties preliminary to the voyage. 2d. That, at the time of filing the libel, no cause of action had arisen upon the contract, and especially none of admiralty cognizance; that to give jurisdiction over a contract even maritime in its nature and subject, the ship must have entered upon the performance, and a breach must occur in the course of the performance; and that if nothing is done at sea under it, jurisdiction cannot attach.

1. The first ground of objection is founded upon a course of reasoning which cannot be maintained. It assumes that the contract is severable, and that parts of it may properly be the subject of admiralty cognizance, being for maritime services, and parts of it not, being for services that relate to subjects not maritime in their nature or object; and that, if the cause of action arises from a breach of the latter stipulations, the remedy is in the common law courts, and if of the former, it may be in the admiralty, assigning the jurisdiction to the different tribunals according to the nature of the stipulations of which a breach is charged.

Now, the short and obvious answer to all this is, that the contract is an entirety; and that, in order to ascertain whether it is the proper subject of admiralty jurisdiction, we must look to the whole and every part of it, the same as we must look to the whole and every part of a contract when endeavoring to ascertain its legal import and effect. It must be wholly of admiralty cognizance, or else it is not at all within it. There cannot be a divided jurisdiction.

The argument is also put in another form. Assuming the contract to be an entirety, and

not partible, and that it must be so viewed in endeavouring to ascertain its nature and character with reference to the jurisdiction to be exercised, it is urged that it must then appear that all its material and substantial parts going to make up the essence of the contract are maritime in their character and object, and for the performance of maritime services; and that, inasmuch as the material parts of the contract in this case are not of that description, but relate to other subjects, such as the fitting up of the ship and limitation of the number of passengers, it cannot be regarded as the subject of admiralty cognizance.

No doubt, if this analysis and interpretation of the contract could be maintained [that the proposition supposes][2] the conclusion would be a sound one. The difficulty lies in that part of the argument. The contract was for the conveyance of the libellant, as a passenger, with his luggage, in the claimants' ship, for a single voyage from New-York around Cape Horn to San Francisco, and the compensation paid was for the conveyance upon that voyage. That was the object to be attained by the libellant and the service to be performed by the master and owners; and all the accompanying stipulations were incidental and subsidiary to the main purpose. They were regulations for the comfort and health of the passenger on the voyage, to be found more or less in all contracts of this description, but which have nothing to do with the determination of the nature or character of the contract, or with the question of jurisdiction; any more than the stipulations for a proper supply of bread and water during the voyage had in the case of The Aberfoyle [supra], or than those for stowage and dunnage of the cargo have in a contract of affreightment of merchandize.

The circumstance that the breach of contract relied on consisted only in the omission to comply with these particular stipulations, is supposed to bear upon the question of jurisdiction, on the ground that they were not the subject of a maritime contract. But, as the contract is an entirety, the failure to comply with any part of it went to the whole, and gave to the libellant such remedy as the nature and character of it entitled him to, whether of admiralty or common law cognizance. He was not bound to accept a part performance, or a tender of part performance, but had a right to demand a strict compliance with every part, and, in case of refusal, to consider the contract as broken, and resort to the proper tribunal for redress.

2. The second ground of objection is equally untenable with the first. It assumes that, in order to give jurisdiction to the admiralty in rem, even in the case of a contract maritime in its nature and subject, and, therefore, of peculiar admiralty cognizance, it is essential that the ship should have entered upon the

---

2 [8 N. Y. Leg. Obs. p. 343.]

performance, and that the breach should have occurred in the course of the voyage; and that, if she refuses to receive the cargo on board, when it is at her side ready to be delivered, or the passenger with his luggage when he is ready to embark, the ship is not bound, and the party aggrieved must look exclusively to the master or owner.

No authority has been referred to in support of this distinction, nor have I been able in my researches to find any; and it seems to be unsustained by principle, or by any of the analogies of the law in respect to the obligation and enforcement of contracts. Maritime contracts do not depend upon locality, but upon the subject matter and the nature of the services to be performed; and, when entered into for the conveyance of goods or persons in a particular ship, they bind the ship for the due performance of the service. The ship itself in specie is considered as pledged for the performance, and this, whether the vessel be in the immediate employment of the owner, or be let by a charter-party to a hirer who is to have the whole control of her. The obligation results directly from the contract, and not from the performance, which is simply in fulfilment and discharge of it. The owner is bound as soon as he or the master settles the terms upon which the ship is to enter upon the service, and it is difficult to perceive why the liability of the latter should be postponed till the inception of performance, or any reason for distinguishing as to the time when the liability of the one and that of the other shall attach.

The distinction cannot depend upon the character of the damages resulting to the shipper or passenger from the breach of the contract at the ship's side, for these may be quite as serious and prejudicial as if it had occurred in the course of the voyage. In the case before us, the libellant had paid the three hundred dollars passage money, and had made all his preparations for a settlement in a distant country, doubtless at a considerable additional expense. That the vessel should be bound to enter upon the performance of the contract at the port of shipment, would seem to be as important and as material to the security of the shipper or passenger, as that she should do so at any period of time after the voyage had commenced.

A distinction was taken on the argument between a maritime contract and a maritime cause of action, and it was urged that, in a proceeding ex contractu in the admiralty, both must concur to give jurisdiction; and that, admitting the contract in this case to be maritime in its character and object, unless it bound the ship, no cause of action in rem existed. This is no doubt correct, and the whole question turns upon the point, whether the ship was bound to the performance. I think it was.

The case was likened on the argument to the case of a contract with a material-man or one for repairs, and it was asked, whether,

if the owner should refuse to permit the repairs, the ship would be liable. I suppose not, for the reason that the liability of the vessel in this class of cases arises from the repairs having been made, or the supplies actually furnished, and not in favor of those who have contracted for them. Short of actual repairs or supplies, the parties must look to the master or the owner for any damages in case of a breach of contract, as no lien attaches to the vessel within the terms of the rule.

Upon the whole, I am satisfied that the decree of the court below is well supported upon the principles of maritime law, and is within the doctrine of the case already determined by this court, and that it should be affirmed.