## THE RICHARD WINSLOW.

### NORTON et al. v. THE RICHARD WINSLOW.

(Circuit Court of Appeals, Seventh Circuit. January 6, 1896.)

#### No. 260.

ADMIRALTY JURISDICTION—MARITIME CONTRACT—STORAGE OF GRAIN IN VESSEL.
    A contract made near the close of the season of lake navigation for the shipment of a cargo of grain from Chicago to Buffalo, the grain to be stored in the vessel at Buffalo until the following spring, is not maritime

in character in respect to the provision for such storage; and admiralty has no jurisdiction of a suit for damage to the grain during the storage. 67 Fed. 259, affirmed.

Appeal from the District Court of the United States for the Eastern District of Wisconsin.

This was a libel by J. Henry Norton and others against the schooner Richard Winslow to recover damages to a cargo of corn. The circuit court dismissed the libel with costs (67 Fed. 259), and the libelants appeal.

On the 16th day of November, 1893, J. Henry Norton and Edward S. Worthington, the libelants, shipped on board the schooner Richard Winslow, then lying at the port of Chicago, a cargo of white corn amounting to 59,779-$\frac{42}{56}$ bushels, to be carried by the schooner from the port of Chicago to the port of Buffalo. The property was shipped under a bill of lading in the usual form, except as hereinafter stated. By the terms of the bill of lading the property was to be delivered at the port of Buffalo to the "order of Norton and Worthington, care of Thomas O'Brien, Buffalo, for shipment to care of ———, New York." The bill of lading contained the following provisions: "Lake freight to Buffalo, three (3) cents per bushel. Including free storage in vessel in Buffalo harbor until April 1st, 1894, to be unloaded at shipper's option on or before April 1st, 1894." The vessel proceeded on her voyage, and arrived safely at the port of Buffalo on the 22d of November, 1893, when her hatches were opened, the cargo examined, and found to be in like order and condition as at the time of shipment. The hatches were then put on, and covered with tarred paper and canvas covers. The schooner was then moored at a place designated by the shippers or their agent in the harbor of Buffalo. The vessel was stripped for the winter, the crew discharged, and the vessel remained in the care of a shipkeeper. In February, 1894, while the schooner was so lying in the harbor of Buffalo with the cargo stowed in her holds, heavy gales from the northeast prevailed, suddenly lowering the water in the harbor from three to four feet, causing the schooner to take the bottom, and straining the butts of her deck, hatch combings, and mast apartment. In consequence of such straining, some 820 bushels of the cargo were damaged and rendered in bad condition, and the remainder to some extent injured by reason of the discolored and damaged portion of the corn mixing with the sound portion. The libel was filed to recover for such damage, it being claimed to have been caused by the negligence of the vessel and her owners. At the hearing below, the libel was dismissed upon three grounds: First, that the contract was not within the cognizance of the admiralty; second, that the liability of the owners at the time of the injury was that of warehouseman, and that there was no neglect or want of ordinary care; third, that there was no liability under the "Harter Act" (27 St. 445, c. 105, § 3).

The opinion of the court below is reported in 67 Fed. 259.

Chas. E. Kremer, for appellants.

George D. Van Dyke, for appellee.

Before WOODS, JENKINS, and SHOWALTER, Circuit Judges.

JENKINS, Circuit Judge, after stating the facts, delivered the opinion of the court.

The contract here was dual in character. It contemplated a carriage by sea from the port of Chicago to the port of Buffalo, and thereafter storage of the cargo in the vessel at the port of Buffalo until the opening of navigation. Such contracts have become frequent upon the Great Lakes with respect to the forwarding of the crops; the ship being thereby assured of a cargo just before the close of navigation, and the shipper obtaining cheap or free storage dur-

ing the closed season of navigation, and being also thereby enabled to reach the seaboard immediately upon the opening of navigation. The question presented is whether this contract with respect to the storage of the corn at the harbor of Buffalo during the closed season of navigation can be deemed a maritime contract, and so within the admiralty jurisdiction. Long ago Judge Story took issue with the common-law courts of England, which sought to restrict the admiralty jurisdiction to causes of action arising "from things done upon the sea," and asserted the true limitation of that jurisdiction to be "to things pertaining to the sea." De Lovio v. Boit, 2 Gall. 398, Fed. Cas. No. 3,776. For many years his position was vigorously assailed, even by the justices of the supreme court; Mr. Justice Campbell in The Magnolia, 20 How. 335, decided in 1857, speaking of it as a "broad pretension for the admiralty, under which the legal profession and this court staggered for thirty years before being able to maintain it." Finally, in 1870, in Insurance Co. v. Dunham, 11 Wall. 1, by the unanimous concurrence of the judges, the position of Judge Story was fully sustained, and the court declared the true criterion of admiralty jurisdiction with respect to contracts "is the nature and subject-matter of the contract as whether it was a maritime contract having reference to maritime service or maritime transactions." A maritime contract must therefore concern transportation by sea. It must relate to navigation, and to maritime employment. It must be one of navigation and commerce on navigable waters. Unquestionably there was here a contract for carriage by sea, and that contract was maritime in its nature. But there was joined with it a contract with respect to the cargo after the completion of the voyage that was in no respect maritime in its nature. If as Judge, now Mr. Justice, Brown observes in The Pulaski, 33 Fed. 383, the storage were a mere incident to the transportation, the entire contract would be held to be maritime, and within the admiralty jurisdiction. But here the contract for holding the corn in storage did not concern navigation. It could not take effect until after completion of the voyage, and had no relation to further transportation of the cargo by the vessel. It was to be performed at a time when the vessel was not engaged in commerce or navigation, or in preparation therefor. It was merely a contract for winter storage, and was no more maritime in its nature than the nonmaritime contracts for winter wharfage (The Murphy Tugs, 28 Fed. 429); for the employment of a dismantled hull (The Hendrick Hudson, 3 Ben. 419, Fed. Cas. No. 6,355); for the storage of a vessel's outfit during winter (Gilbert Hubbard & Co. v. Roach, 2 Fed. 393); or for the service of a shipkeeper during winter (The Sirius, 65 Fed. 226). The reason is that such service does not pertain to the navigation of a ship, nor assist a vessel in the discharge of a maritime obligation.

It is alleged that at the time of the injury in question the maritime contract of affreightment was not ended, and could only be completed by a delivery of the cargo, which here remained in the possession of the vessel; but we think that under the terms of the bill of lading in question the contract of storage was to take effect upon the arrival of the vessel in the harbor at Buffalo, and that there was constructive

delivery which would terminate the liability of the carrier as such. Here the cargo was not to be delivered to the consignee in pursuance of the contract of carriage, but was to be held by the carrier upon storage as warehouseman only, upon the completion of the voyage. The character in which the cargo was held by the vessel changed from that of carrier to that of warehouseman. The maritime service had been performed fully and completely within the letter and spirit of the contract. Thereafter the cargo was held by the vessel as warehouseman under the liability attached to that relation. Because the ship was afloat when used as a warehouse does not render the contract for storage a maritime contract, any more than in the case of a floating warehouse, a floating saloon, or a floating church. Such employment does not pertain to navigation, with which alone the admiralty is concerned. The force of the position was felt by the learned counsel for the appellant, who urged upon us at the argument, with earnestness and with a zeal born of his liking for the admiralty jurisdiction, that because such transactions as this have become frequent upon the Lakes and the courts of admiralty can, as was asserted, more efficiently pass upon such cases, it will be detrimental to the interests of commerce and to the commercial community to deny a remedy upon such contracts in the courts of admiralty. Without criticising the suggestion, we can only say that, however convenient it might be to do so, we do not think it our duty to extend the admiralty jurisdiction beyond its well-established limitations and to a subject-matter that does not pertain to navigation. The decree of the district court will be affirmed.